UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| JANET C. STEVENS, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 5:14-cv-00058 |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner, | ) | By: Joel C. Hoppe |
| Social Security Administration, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Janet C. Stevens asks this Court to review the Commissioner of Social Security's
("Commissioner") final decision denying her applications for disability insurance benefits
("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security
Act, 42 U.S.C. §§ 401–34, 1381–1383f. The case is before me by referral under 28 U.S.C. §
636(b)(1)(B). Having considered the administrative record, the parties' briefs, and the applicable
law, I find that the Commissioner's decision is not supported by substantial evidence and that
remand for further administrative proceedings is necessary.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final
decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.
Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not
"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for
that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court
asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and
whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700,
704 (4th Cir. 2011).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant

2

bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Stevens filed for DIB and SSI on November 4, 2011. R. 11. She was fifty-eight years old at the time, R. 143, and had worked most recently as an accounting and payroll clerk, R. 486. Stevens alleged disability beginning November 4, 2011, because of severe back pain, impairments in her cervical and lumbar spine, irritable bowel syndrome, and other digestive disorders. *Id.*

Stevens had two hearings at the administrative level. The first occurred on January 20, 2013, R. 52–77, and resulted in an April 24, 2013, opinion finding that she was disabled as of June 1, 2012, R. 208–21. The Appeals Council remanded that decision. R. 29. It determined that the ALJ had not supported his decision and instructed him on remand to "provide rationale with specific references to evidence of record to support [his] assessed limitations," and to obtain evidence from a medical expert if necessary to improve clarity. *Id.* The ALJ held a second hearing on February 20, 2014. R. 80–142. At both hearings Stevens appeared with counsel and testified to her past work, her medical conditions, and the limitations her conditions have on her daily activities. *See* R. 56–68, 70–72, 85–112, 130–31. Vocational experts ("VE") also testified to the nature of Stevens's past work and her ability to perform other jobs in the national and local economy. *See* R. 69–70, 73–76, 128–30, 132–41. At the second hearing, a medical expert ("ME") testified about the medical evidence in the record and the impact of Stevens's impairments on her functional capacity. *See* R. 112–27.

On May 30, 2014, the ALJ issued a second opinion denying Stevens's applications. R. 29–40. He found that Stevens had the severe impairment of a discogenic and degenerative back

disorder, but determined that it did not meet or equal a listing. R. 31–32. The ALJ found that Stevens had the residual functional capacity ("RFC")[1] to perform light work[2] with climbing and postural limitations. R. 32–39. Relying on the VE's testimony, the ALJ concluded at step four that Stevens can return to her past relevant work as an accounts payable clerk. R. 40. He therefore determined that Stevens is not disabled under the Act. *Id.* After the Appeals Council declined to review that decision, R. 7–9, Stevens submitted additional evidence, R. 1. The Appeals Council determined the evidence was not relevant to the period at issue and declined to reopen her case. *Id.* This appeal followed.

### III. Relevant Medical Evidence

On July 23, 2011, Stevens visited the emergency department at Rockingham Memorial Hospital, reporting pain radiating down her right leg. R. 547–48. Her medical history included lumber decompression surgery in 2007, from which she recovered well. R. 547, 761–65. An X-ray taken on July 23 showed postoperative changes and some disc space narrowing at L4-L5 and L5-S1. R. 547, 549. She improved significantly after intramuscular injections and was discharged in good and stable condition with prescriptions for painkillers. R. 547–48.

On July 28, 2011, Stevens saw Kathleen Iudica, M.D., R. 555, who had been her primary care physician since December 2009, R. 601. Dr. Iudica's treatment notes are handwritten and largely illegible. *See* R. 552–59, 645. It is evident, however, that she generally treated Stevens for depression, dyslipidemia, and back pain. R. 555–59, 601. On July 28, 2011, Dr. Iudica

---

[1] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her impairments. 20 C.F.R. § 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

[2] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting requirements can perform light work only if she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

4

additionally assessed sciatica and recommended physical therapy. R. 555. Stevens returned to Dr. Iudica on August fourth with bowel issues. R. 554. Dr. Iudica assessed diarrhea and fecal incontinence and referred Stevens for a colonoscopy. *Id.*

Stevens returned to the emergency department on August 8, 2011. R. 543. She reported increased pain radiating down her right leg since picking up a garbage bag a few days before. *Id.* She had normal strength and reflexes, but was uncomfortable to palpation in her lumbar spine near her right sciatic nerve. *Id.* The attending physician diagnosed acute sciatica and discharged Stevens with painkillers and instructions to return if her symptoms worsened. *Id.* Stevens returned on August eleventh, complaining of intermittent but worsening pain beginning in her right gluteal region and radiation down to her right posterior calf. R. 540. On physical examination, she had full strength, reflexes, and sensation; no pain on straight-leg raising bilaterally; tenderness to palpation in her right gluteal region, but not her back; and complete range of motion in her hips, with some pain on full hip flexion. *Id.* The attending physician assessed sciatica or SI joint dysfunction, prescribed medication, and instructed her to follow up with her primary care physician. *Id.*

On November 14, 2011, Stevens saw Dr. Iudica to refill her prescriptions and reported that her back pain continued. R. 552. She informed Dr. Iudica that she had lost her job and was applying for disability. *Id.* On December 12, 2011, Dr. Iudica completed a Multiple Impairment Questionnaire and accompanying letter, both concluding that Stevens was unable to work. *See* R. 564–71, 601. At Stevens's request, R. 648, Dr. Iudica wrote a second letter on June 18, 2012, which repeated more briefly her opinion that Stevens was unable to work, R. 649.

Stevens began treatment with orthopedist Mark E. Coggins, M.D., on July 3, 2012. R. 650–55. She reported moderate aching pain that began six weeks earlier in her right lower back

and radiating down her right leg. R. 651. Her associated symptoms included bowel incontinence, decreased mobility, gait disturbances, spasms, tenderness, and leg weakness. *Id.* She reported numbness in her right lateral foot, outside two toes, and, recently, her right hand and fifth finger. *Id.* She experienced little relief from heat, lying down, or prescription medication, but had not attempted other treatment measures. *Id.* On physical examination, Stevens had a normal gait, no spasm or weakness, tenderness to palpation in her right posterior superior iliac spine, normal range of motion, pain in her right leg on straight leg raising, and restriction of lumbar flexion with some right buttock pain past eighty degrees. R. 653–54. Dr. Coggins assessed right lumbar radiculopathy and suggested physical therapy, a Medrol Dosepak, and an MRI if symptoms continued. R. 655. Stevens elected to try the Medrol. *Id.*

On July 24, 2012, Stevens told Dr. Coggins that her pain had worsened over the past three weeks and the Medrol had not provided any relief. R. 663. Dr. Coggins discussed surgical options and ordered an MRI. R. 665. The MRI revealed diffuse multilevel degenerative disc disease from L1-2 through L4-5, with a right posterolateral disc extrusion at L5-S1 compressing the right S1 nerve root within the lateral recess. R. 681. Stevens returned to Dr. Coggins on October eighth. R. 697–701. He reviewed her MRI, assessed a lumbar herniated disc, and suggested surgery. R. 700.

On October 19, 2012, Dr. Coggins performed a right L5-S1 laminotomy and partial diskectomy. R. 703–04. Stevens was kept overnight for pain control after experiencing significant low back pain immediately postoperatively. R. 708. She was discharged the next day with a satisfactory ability to move around and her pain under better control. *Id.*

Stevens had her first post-surgical appointment with Dr. Coggins on November 1, 2012. R. 742–46. She reported intermittent lower back pain that did not radiate down her leg and some

residual numbness in her right foot. R. 743. Her pain and stiffness were more pronounced in the morning, but painkillers provided relief. *Id.* Stevens had no abnormalities on physical examination apart from decreased sensation to light touch on her right lateral foot, and Dr. Coggins concluded that she was post-operatively stable. R. 744–45. He advised that she continue to protect her lower back, limit her lifting to ten to twelve pounds, and bend at her knees rather than her back. R. 745.

On January 14, 2013, Stevens informed Dr. Coggins that she had fallen in December and landed on her knees. R. 738. Since the fall, she had experienced upper lumbar and left sided back pain, with left leg pain radiating to the knee and tingling in her left leg. *Id.* Stevens had continued right foot numbness, but denied numbness elsewhere. *Id.* On physical examination, Stevens had tenderness in the left L2-3 paraspinous region, the midline at L5-S1, and the posterior superior iliac spine bilaterally. R. 739. She had decreased reflexes in her Achilles tendons, but normal gait and muscle strength and no spasm. R. 739–40. An X-ray taken that day showed severe L4-L5 and L5-S1 degenerative disc space narrowing, but no acute fractures. R. 740. Dr. Coggins assessed left lumbar radiculopathy, and they discussed treatment with physical therapy, oral steroid medication, and an MRI. R. 740–41. Stevens elected to initially try medication. R. 740.

Dr. Coggins completed a Spinal Impairment Questionnaire on January 29, 2013, finding that Stevens could sit, stand, and walk for a total of seven hours in an eight-hour work day. R. 717–22.

Stevens returned to Dr. Coggins on February 11, 2013, reporting that the steroids did not provide relief and that she continued to suffer lower back and left gluteal pain radiating to her left thigh. R. 733. She endorsed swelling in her lower back, but denied numbness apart from right foot tingling. *Id.* On examination, Stevens had decreased reflexes in her Achilles tendons

7

and right greater than left posterior superior iliac spine tenderness, but normal gait, muscle tone, strength, and sensation. R. 734–35. Stevens stated that she did not have insurance coverage to undergo additional testing, and Dr. Coggins instructed her to continue with symptomatic care and return as needed. R. 735. Dr. Coggins completed a second Spinal Impairment Questionnaire that day. R. 724–30.

On February 14, 2013, Stevens saw Dr. Iudica for a follow-up on her cholesterol treatment. R. 850–53. She reported being unable to afford her medications for the past four to five months. R. 850. She endorsed back pain, but denied weakness, swelling, tingling, and numbness. R. 851.

Stevens reported to Dr. Iudica on June 24, 2013, with complaints of worsening fatigue and constipation. R. 873. She denied neck or back pain, swelling, muscle weakness, tingling, and numbness. R. 874.

On December 12, 2013, Stevens returned to Dr. Iudica requesting that she complete additional disability paperwork. R. 883–85. She reported severe and constant bilateral lower back pain radiating into both legs, difficulty walking, and fatigue. R. 883. Bending, lifting, and walking aggravated her symptoms. *Id.* She stated that she was still unable to work because of back pain and fatigue. *Id.* On physical examination, Stevens had full range of motion, no tenderness, and normal strength in her spine and surrounding muscles. R. 885. Her strength, motor function, and reflexes were normal in her upper and lower extremities. *Id.* She had intact sensation to light touch in all extremities. *Id.* Dr. Iudica provided Stevens with a home exercise program and instructed her to avoid aggravating tasks or lifting greater than ten pounds until her symptoms resolved. R. 888. Dr. Iudica also completed a second Multiple Impairment Questionnaire that was substantially similar to her first. R. 750–57.

8

On December 26, 2013, Stevens returned to Dr. Coggins also requesting additional disability paperwork. R. 889–91. She endorsed lower back pain with some radiating into her left leg and said her pain was not significantly changed over the past ten months. R. 890. She also reported continued pain and numbness in her right foot. *Id.* On physical examination, she had normal gait and paraspinous muscle tone; no pain on straight leg raising, spasm, or tenderness; and normal reflexes, sensation, and strength throughout her lower extremities. R. 891. Dr. Coggins recommended continued symptomatic care and an MRI if Stevens acquired insurance coverage. *Id.* He also noted that he could not assign a disability onset date before June 1, 2012, because in her initial visit, Stevens reported an onset of symptoms only a few weeks before she saw him. *Id.*

## IV. Discussion

On appeal, Stevens argues that the ALJ did not properly weigh the medical opinions in the record, *see* Stevens Br. 13–17, ECF No. 13, and failed to properly evaluate her credibility, *id.* at 18–19.

A.      Opinion Weight

Stevens contends that the ALJ gave too little weight to the opinions of Drs. Iudica and Coggins without adequate explanation, and relied too heavily on the opinion of the testifying medical expert, Dr. Alexander. *Id.* at 13–17.

*1.      Medical Opinions*

Dr. Iudica completed her first Medical Impairment Questionnaire on December 12, 2011. R. 564–71. She diagnosed Stevens with degenerative joint disease and degenerative disc disease of the lumbar spine with a poor prognosis. R. 564. She based this diagnosis on tenderness on physical exam and the degenerative changes and disc space narrowing shown on the July 23,

Case 5:14-cv-00058-EKD-JCH   Document 19   Filed 01/04/16   Page 9 of 23   Pageid#: 1006

2011, X-ray. *Id.* She opined that Stevens could occasionally lift or carry up to five pounds, could sit for one hour and stand or walk for less than one hour in an eight-hour workday, and would be unable to keep her neck in a constant position or push, pull, kneel, bend, or stoop. R. 566–68. Stevens was also markedly limited in her ability to grasp, turn, or twist objects or use her arms for reaching and moderately limited in using her hands for fine manipulation because these activities exacerbated her back pain. R. 567–68. Stevens would need to take daily unscheduled breaks and miss work more than three times a month. R. 569–70. Dr. Iudica also stated that Stevens's depression would contribute to her functional limitations, making her unable to handle more than a low amount of work stress, and her pain would frequently interfere with her concentration. R. 569.

Dr. Iudica completed the second questionnaire on December 12, 2013. R. 750–57. Her opinion was largely the same as her first with a few differences. She found that Stevens could sit and stand for less than an hour in an eight-hour workday, had minimal manipulative restrictions, and would need to take unscheduled breaks every ten minutes. R. 752–56. Her pain would now constantly interfere with her ability to concentrate, but she was capable of dealing with low or moderate stress. R. 755.

Dr. Coggins completed a Spinal Impairment Questionnaire on January 29, 2013. R. 717–22. He listed Stevens's most recent diagnosis as left lumbar radiculopathy with a fair prognosis. R. 717. He opined that she could sit for five hours and stand or walk for two hours in an eight-hour work day; would need to get up for five minutes every thirty to forty-five minutes; and could frequently lift or carry ten pounds and occasionally lift or carry fifty pounds. R. 720–21. He stated that Stevens needed to avoid heights, had limited ability to bend or stoop, and should avoid pushing or pulling heavy weights. R. 722. He found that her depression contributed to her

10

functional limitations, but her pain would never interfere with her attention and concentration. R. 721.

Dr. Coggins completed a second Spinal Impairment Questionnaire two weeks later on February eleventh. R. 724–30. Stevens testified that she and Dr. Coggins went over the second questionnaire together; she told him what she could or could not do, and he wrote the limitations that she reported on the form. R. 104–05. Dr. Coggins wrote that Stevens could still sit for five hours and stand or walk for two hours in an eight-hour work day, but would need to get up for five minutes every twenty to thirty minutes. R. 727. She could frequently lift or carry five pounds, but only occasionally lift or carry ten pounds. R. 728. Stevens's pain seldom interfered with her attention and concentration, but she would need to take three to four unscheduled five to ten minute breaks per day and would have two to three absences from work a month. R. 728–29. He identified the same postural limitations as in his first opinion, but added that she should avoid pushing or pulling weights over twenty pounds. R. 730.

Haddon Alexander, M. D., examined Stevens's medical record and testified as a medical expert at the second administrative hearing. R. 109–28. Dr. Alexander opined that from the worsening of her back pain in July 2012 through her back surgery on October 19, 2012, Stevens's testimony concerning the severity and limiting effects of her pain was credible based upon the objective evidence of radiculopathy. R. 115–18, 123. Her condition continued through January 14, 2013, when the objective signs indicated that she had recovered from the surgery. R. 119. Dr. Alexander opined that after January fourteenth, Stevens could lift, carry, push, or pull ten pounds frequently and twenty pounds occasionally, had no limitations on her ability to sit or stand, and could walk for sustained periods of thirty minutes before needing to sit or stand for ten minutes. R. 120–21. She would require a sit-stand option at work. R. 120. She could not climb

11

ropes, ladders, or scaffolding and should only occasionally balance, crouch, kneel, crawl, or climb ramps and stairs. R. 121. She had no manipulative, vision, or communication limitations, but should avoid heights. *Id.*

### 2. The ALJ's Decision

The ALJ gave Dr. Iudica's December 12, 2013, opinion no weight because it was not supported by medical signs and findings. R. 39. Specifically, he noted that when Dr. Iudica saw Stevens "on December 12, 2013, the claimant reported back pain radiating down both legs; however, her physical exam findings with regard to her back and lower extremities were normal." *Id.* The ALJ also considered Dr. Alexander's testimony that Stevens's neurological findings were normal when she was seen in January 2013 and determined that Dr. Iudica's assessment of Stevens's limitations was "totally inconsistent" with the objective evidence. *Id.*

The ALJ gave Dr. Coggins's second opinion "little if any weight" because Stevens testified that she told Dr. Coggins what to put on the form as he completed it. *Id.* He found Dr. Coggins's first opinion unsupported by the record, stating "[a]lthough the claimant reported significant pain, the physical findings in regard to her back and lower extremities were normal when Dr. Coggins examined her on December 26, 2013." *Id.* The ALJ also noted that Dr. Coggins's finding that Stevens could sit for five hours and stand for two hours fell just short of an eight-hour work day. *Id.* Comparing that to Dr. Alexander's opinion that Stevens could complete a work day, the ALJ concluded that "weight is given to the assessment of the independent medical expert who testified at the hearing, and was subject to cross-examination, over the unsupported opinions of Dr. Iudica and Dr. Coggins." *Id.*

Directly addressing Dr. Alexander's opinion, the ALJ adopted his RFC recommendation in full "because it best comports with the evidence as a whole." *Id.*

Case 5:14-cv-00058-EKD-JCH   Document 19   Filed 01/04/16   Page 12 of 23   Pageid#: 1009

3.    *Analysis*

"Medical opinions" are statements from "acceptable medical sources," such as physicians, that reflect judgments about the nature and severity of the claimant's impairment, including her symptoms, diagnosis and prognosis, functional limitations, and remaining abilities. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical consultants. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). A treating-source medical opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir.2001); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ finds that a treating-source medical opinion is not entitled to controlling weight, then he must weigh the opinion in light of certain factors including the source's medical specialty and familiarity with the claimant, the weight of the evidence supporting the opinion, and the opinion's consistency with other relevant evidence in the record. *Burch v. Apfel,* 9 F. App'x 255, 259 (4th Cir.2001) (per curiam); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ must consider the same factors when weighing medical opinions from non-treating sources. 20 C.F.R. §§ 404.1527(c), 404.1527(e)(2), 416.927(c), 416.927(e)(2).

The ALJ must explain the weight given to all medical opinions, *Radford v. Colvin,* 734 F.3d 288, 295–96 (4th Cir.2013), and he must give "good reasons" for the weight assigned to any treating-source medical opinion, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro,* 270 F.3d at 178 (the ALJ may reject a treating-source medical opinion "in the face of persuasive contrary evidence" only if he gives "specific and legitimate reasons" for doing so). His "decision 'must be

13

sufficiently specific to make clear to any subsequent reviewers the weight [he] gave' to the opinion and 'the reasons for that weight.'" *Harder v. Comm'r of Soc. Sec.*, No. 6:12cv69, 2014 WL 534020, at *4 (W.D. Va. Feb. 10, 2014) (citing SSR 96–8p, at *5).

The ALJ provided the same reason for giving little to no weight to Dr. Iudica and Dr. Coggins's opinions—they conflicted with the generally unremarkable physical findings on contemporaneous examinations, specifically referencing Dr. Coggins's January 14 and December 26, 2013, examinations and Dr. Iudica's December 12, 2013, examination. Stevens argues that the ALJ erred by "focusing on the examination results from two visits that are two weeks apart in the face of a medical record that spans several years." Stevens Br. 15.

Stevens misinterprets the ALJ's findings. The three examinations cited by the ALJ span eleven months, the first occurring at one of Stevens's post-surgical follow-ups, R. 738–41, and the second two occurring contemporaneously with Dr. Iudica's opinion, R. 883–85, 890–91. The ALJ also noted that Dr. Coggins's examination in February 2013 revealed the same normal findings as in the previous month. R. 38. The ALJ did not "cherry-pick" supporting treatment notes from the record, Stevens Br. 15, but rather confined his analysis to the relevant records— treatment notes discussing Stevens's condition after her major surgical intervention. In analyzing the medical opinions, the ALJ relied upon the generally unremarkable findings on examination after January 14, 2013, and Dr. Coggins and Dr. Alexander's concurring opinions that the record did not establish a disabling impairment prior to June 1, 2012. R. 38–39.

The ALJ's discussion of the medical evidence generally supports his analysis of the medical opinions. Two weeks after her surgery, Stevens still had intermittent pain, but it was relieved by painkillers, and the only abnormal finding on physical examination was decreased sensation to light tough on her right lateral foot. R. 743–45. On January 14, 2013, after a fall in

14

December, Stevens had decreased reflexes in her Achilles tendon and tenderness in the left L2-3 paraspinous region, the midline at L5-S1, and the posterior superior iliac spine bilaterally, but also had normal gait and muscle strength, no spasm, and normal straight leg raising test. R. 738– 40. Imaging revealed severe degenerative disc disease and disc space narrowing at L4-L5 and L5-S1, but surgery had resolved the nerve root compression. R. 740. By February eleventh, Stevens had decreased reflexes in her Achilles tendon and right greater than left posterior superior iliac spine tenderness, but normal gait, muscle tone, strength, and sensation. R. 734–35. Three days later, during a follow-up for cholesterol management, Stevens reported back pain, but denied weakness, swelling, tingling, and numbness. R. 851. On June 24, 2013, she denied neck or back pain, swelling, muscle weakness, tingling, and numbness. R. 874. Finally, when Stevens returned to both Dr. Iudica and Dr. Coggins in December requesting additional disability paperwork, both performed physical examinations. Dr. Iudica found that Stevens's spine and lower extremities had full range of motion, no tenderness, normal strength, normal reflexes, and intact sensation to light touch. R. 885. Dr. Coggins found that she had a normal gait and paraspinous muscle tone; no pain on straight leg raising, spasm, or tenderness; and normal reflexes, sensation, and strength throughout her lower extremities. R. 891.

In concluding that Dr. Iudica and Dr. Coggins' opinions were not supported by the medical record, the ALJ cited to the January 14, 2013, post-operative note contemporaneous with Dr. Coggins's opinion and the examinations by both doctors contemporaneous with Dr. Iudica's opinion. The disparity between the doctors' opinions and the objective medical evidence, including their own treatment notes, provides an adequate basis under the regulations for the ALJ's decision to assign their opinions little or no weight. *See Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (substantial evidence supported ALJ's decision to reject treating physician's

15

conclusory opinion where the opinion was not supported by the physician's own treatment notes and was inconsistent with other evidence in the record); *Kersey v. Astrue*, 614 F. Supp. 2d 679, 693 (W.D. Va. 2009) (noting that the ALJ may assign little or no weight to a treating-source opinion "if he sufficiently explains his rationale and if the record supports his findings").

Finally, Stevens contends that the ALJ gave too much weight to the opinion of Dr. Alexander, a non-examining physician, and failed to adequately explain the reasons for that weight. Opinions from non-treating sources are not entitled to any particular weight, *see* 20 C.F.R. §§ 404.1527(c), 416.927(c), and should be weighed in light of factors including the source's medical specialty and familiarity with the claimant, the weight of the evidence supporting the opinion, and the opinion's consistency with other relevant evidence in the record, *id.* §§ 404.1527(c)(2), 416.927(c)(2).

The ALJ found that Dr. Alexander's opinion was consistent with the medical evidence. Dr. Alexander testified that Stevens was able to work from November 2011 until June 2012 when her symptoms increased, which was consistent with Dr. Coggins's opinion. *See* R.117–19, 218. Dr. Alexander determined that Stevens's post-surgical treatment notes indicated functional improvement and a recovery period ending on January 14, 2013. R. 119. His opinion of Stevens's functional capabilities rested largely upon his conclusion that following Stevens's recovery from surgery, her examination findings and the other objective evidence were normal. R. 117, 119–20. Dr. Alexander provided a thorough explanation of his opinion and cited specific portions of the record to support his determination. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (weight given to a non-examining physician's opinion depends upon the supportability of his explanation for that opinion). The testimony of a non-examining non-treating physician may properly "be relied upon when it is consistent with the record." *Gordon v.*

16

*Schweiker*, 725 F.2d 231, 234 (4th Cir. 1984); *see* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion."). Thus, the ALJ had an adequate basis to credit Dr. Alexander's opinion.

The ALJ properly analyzed the objective medical evidence in assessing what weight to afford these physicians' opinions. As explained in the next section, however, the ALJ improperly assessed Stevens's credibility and her report of the intensity of her pain. As the flawed credibility analysis requires remand, the ALJ should also reconsider how a proper credibility analysis affects his evaluation of the physicians' opinions about the "nature and severity of [Stevens's] impairment(s), including [her] symptoms," such as pain. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

B.    Credibility

Stevens argues that the ALJ's reasons for discounting her credibility were vague, and he failed to address the various factors required by the regulations. Stevens Br. 19. She also states that the ALJ's comment that no "neurological findings" support her testimony is apposite, as her condition is primarily musculoskeletal rather than neurological. *Id.*

1.    *Stevens's Testimony*

Stevens testified that she believes she was terminated from her job in November 2011 for health issues, R. 56–57, and that her pain caused her difficulty concentrating and led her to miss work or have to leave early, R. 57, 88–89. Her October 2012 surgery resolved most of her right-sided back pain, but she continues to have pain in her left back, numbness in her right foot, and shooting pain down her right leg. R. 58, 60–61, 89–90. Her medications are "somewhat" helpful at relieving her pain. R. 61, 92–93. She testified that she could sit for fifteen to twenty minutes and stand for five to ten minutes at a time and could lift or carry up to five pounds. R. 60–62, 90.

17

Stevens stated her "daily activities are very limited," R. 63, consisting mostly of napping, watching television, reading, and crocheting, though her pain interferes with her concentration, R. 63–64 95–96, 100–03. She sleeps only four hours a night and has to lie down two to three hours every day or every other day. R. 93, 87. She drives once or twice a week, but cannot drive more than fifteen minutes because of right foot numbness. R. 101–02. Her husband and mother-in-law do most of the cooking and household chores. R. 64, 95–99. She testified that Dr. Coggins recommended that she get a cane, which she uses on occasion along with electric carts at the grocery store. R. 62–63, 93–94.

### 2. The ALJ's Decision

The ALJ summarized Stevens's testimony in detail, R. 33–36, and concluded that her medically determinable impairment could reasonable produce her alleged symptoms, but her "allegations as to the intensity, frequency, and duration of her pain during any period of 12 continuous moths or more are inconsistent with the lack of objective neurological findings for any such time period," R. 36. The ALJ then evaluated the medical evidence and Dr. Alexander's testimony, R. 36–39, including his responses to the ALJ's questions about when the objective evidence did and did not support Stevens's allegations of pain, R. 38.

### 3. Analysis

The regulations set out a two-step process for evaluating a claimant's allegation that she is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart,* 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. § 404.1529). The ALJ must first determine whether objective medical evidence[3] shows that the claimant has a medically

---

[3] Objective medical evidence is any "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of

18

determinable impairment that could reasonably be expected to cause the kind and degree of pain alleged. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also Craig,* 76 F.3d at 594. If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's pain to determine the extent to which it affects her physical or mental ability to work. SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996); *see also Craig,* 76 F.3d at 595.

The latter analysis often requires the ALJ to determine "the degree to which the [claimant's] statements can be believed and accepted as true." SSR 96–7p, at *2, *4. The ALJ cannot reject the claimant's subjective description of her pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). A claimant's allegations of pain "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." *Craig*, 96 F.3d at 595. The ALJ must consider all the evidence in the record, including the claimant's other statements, her daily activities, her treatment history, any medical-source statements, and the objective medical evidence, including "objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.)." *Id.* (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)). The ALJ must give specific reasons, supported by relevant evidence in the record, for the weight assigned to the claimant's statements. *Eggleston v. Colvin,* No. 4:12cv43, 2013 WL 5348274, at *4 (W.D. Va. Sept. 23, 2013) (citing SSR 96–7p, at *4).

_____

medically acceptable diagnostic techniques." 20 C.F.R. §§ 404.1528(b)–(c), 416.928(b)–(c). "Symptoms" are the claimant's description of his or her impairment. *Id.* §§ 404.1528(a), 416.928(a).

19

A reviewing court will defer to the ALJ's credibility finding except in those "exceptional" cases where the determination is unclear, unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all. *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Edelco, Inc. v. NLRB,* 132 F.3d 1007, 1011 (4th Cir. 1997)); *see also Mascio v. Colvin,* 780 F.3d 632, 640 (4th Cir. 2015).

Stevens objects to the ALJ's use of the phrase "lack of objective neurological findings" in his credibility finding. Stevens Br. 19. She argues that the ALJ's wording is generally vague and the specific term "neurological findings" does not encompass the majority of her musculoskeletal impairment. *Id.* She concludes that there is no indication that the ALJ adequately considered other evidence, such as additional medical findings and her hearing testimony, in reaching his credibility determination. *Id.*

On the contrary, the ALJ's decision demonstrates that he paid close attention to the complete record. He spent three pages outlining Stevens's testimony in great detail, including the specific questions asked and her responses. *See* R. 33–36. He summarized her daily activities, functional limitations, and descriptions of pain. *Id.* Claiming that the ALJ did not fully consider Stevens's testimony mischaracterizes the content of his review of the record. As his credibility determination states, the ALJ discounted Stevens's statements of pain only when they contrasted with unremarkable findings on multiple concurrent examinations. The ALJ's attention to the relationship between Stevens's statements of pain and contemporaneous objective findings is evident from his statements at her second hearing and his findings regarding Stevens's credibility and the limitations assessed by her treating physicians. *See, e.g*, R. 36, 39 (noting complaints of pain radiating into lower extremities, but normal physical exam findings). The ALJ questioned Dr. Alexander about the medical findings from the months leading up to Stevens's surgery,

20

which included pain on straight leg raising, sensory deficit in her right leg, and an MRI demonstrating a herniated disc in contact with a nerve. R. 115–18. The ALJ pressed Dr. Alexander repeatedly on whether a person suffering from the amount of pain Stevens testified to experiencing during this time would be able to work. R. 117–18. In his final RFC determination, the ALJ did not conclude that Stevens could perform any type of work during the period leading up to her surgery, but restricted his RFC finding to before June 1, 2012, and after January 14, 2013, when the objective findings were less remarkable. R. 39.

Additionally, when taken in context, the ALJ's use of the phrase "neurological findings" refers to objective examination findings generally. The physical examination paperwork in the Administrate Record often lists various findings relevant to spinal impairments under the category "neurological." *See, e.g.*, R. 547 (analyzing extremity strength and sensory deficits under the category neurological findings), 881 (including findings on muscular weakness and tingling or numbness in the neurologic category). The ALJ did not restrict his summary of the medical record to findings listed under the neurological heading, but included all relevant examination results regardless of their categorization. *See* R. 36–39. The ALJ's description of the 2013 treatment notes that he relied upon in his credibility and opinion analyses includes findings on muscle strength, sensory deficit, tenderness to palpation, and straight leg raising tests. R. 38. Considering the ALJ's thorough review of the medical evidence, his use of the phrase "neurological findings" is reasonably understood to refer to objective examination findings.

In reviewing the medical evidence, the ALJ noted that Stevens had a compressed nerve root, sensory deficit, and positive straight leg raising indicative of radiculopathy prior to surgery. R. 37. He found that after surgery these issues resolved. R. 38. As described in detail in the previous section, physical examinations on January 14, February 11, December 12, and

21

December 26, 2013, all had unremarkable findings as to Stevens's strength, reflexes, and sensation, and she had no spasm, normal straight leg raising test, and normal gait. R. 734–35, 739–40, 885, 891. X-rays taken on January 14 also showed that Stevens had severe degenerative disc disease at L4-L5 and L5-S1. R. 740.

The ALJ's credibility analysis focused on the objective medical evidence, which the Fourth Circuit has identified as a "crucial" factor. *Craig*, 76 F.3d at 595. This portion of his analysis was reasonable. The ALJ erred, however, in limiting his analysis and explanation of the credibility determination to only objective evidence. In *Hines v. Barnhart*, the Fourth Circuit reiterated that a claimant may rely on subjective evidence to prove the intensity of the pain alleged. 453 F.3d 559, 565 (4th Cir. 2006). Having found that an underlying impairment could cause Stevens's symptoms, the ALJ impermissibly rejected her subjective complaints regarding the intensity of her pain solely because he determined they were inconsistent with objective medical evidence. The ALJ was required to explain how the other relevant evidence in the record informed his credibility analysis. *See Craig*, 76 F.3d at 595 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)) (explaining the various types of evidence an ALJ must consider). A broader analysis and explanation of credibility is particularly warranted in this case where the ALJ found in his first opinion that Stevens's allegations were "generally credible." R. 218.

On remand the ALJ must conduct a proper credibility analysis and then determine how Stevens's complaints of pain affect her functioning. *See Mascio* 780 F.3d at 639 ("an ALJ is required to consider a claimant's pain as part of his analysis of residual functional capacity.").

## V. Conclusion

Because the ALJ erred in assessing Stevens's complaints of pain and allegations of functional limitations, the Commissioner's final decision is not supported by substantial

Case 5:14-cv-00058-EKD-JCH   Document 19   Filed 01/04/16   Page 22 of 23   Pageid#: 1019

evidence. Remand is required so that the ALJ may conduct a proper credibility analysis, reweigh

the physicians' opinions regarding the severity of her symptoms, and fashion an appropriate RFC

that incorporates all of Stevens's limitations, including any complaints of pain deemed credible.

Accordingly, I recommend that the Court **GRANT** Stevens's motion for summary judgment,

ECF No. 13, **DENY** the Commissioner's motion for summary judgment, ECF No. 17, and

**REMAND** this case for further administrative proceedings.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy of this [Report and
> Recommendation], any party may serve and file written objections to such
> proposed findings and recommendations as provided by rules of court. A judge of
> the court shall make a de novo determination of those portions of the report or
> specified proposed findings or recommendations to which objection is made. A
> judge of the court may accept, reject, or modify, in whole or in part, the findings
> or recommendations made by the magistrate judge. The judge may also receive
> further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the Elizabeth K. Dillon, United States District

Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel

of record.


ENTER: January 4, 2016

*Joel C. Hoppe*

Joel C. Hoppe
United States Magistrate Judge

23